**MUTUAL AID ASSOCIATION OF THE CHURCH OF THE BRETHREN,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**Civ. A. No. 80–4142.**

United States District Court,
D. Kansas.

Oct. 11, 1983.

Forty-Three and Forty-Four.

Allan A. Hazlett, Topeka, Kan., William J. Lehrfeld, Leonard J. Henzke, Jr., Lehrfeld & Henzke, Washington, D.C., for plaintiff.

Jim J. Marquez, U.S. Atty., Karen Humphreys, Asst. U.S. Atty., Topeka, Kan., G. Scott Nebergall, Trial Atty., Tax Div., Stephen G. Fuerth, Chief, Civil Trial Sec., Western Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

O'CONNOR, Chief Judge.

This is an action for refund of $102,-735.36 in federal income taxes plus interest paid by the plaintiff for the taxable periods ending on December 31st of the years 1975 through 1980. The matter is presently before the court on the motion of the defendant, the United States of America, for summary judgment, and the cross-motion for summary judgment of the plaintiff, the Mutual Aid Association of the Church of the Brethren (MAA).

### Factual Background

On December 23, 1982, the parties filed a pretrial order, including a stipulation of facts, as well as a supplemental stipulation of facts. The facts contained in the two stipulations are accepted by the court as uncontroverted and have been considered by us in ruling on the pending motions. Although we need not recite all of the facts contained in the stipulations, the following are of some help in explaining the background and defining the issues of the case.

"Plaintiff [MAA] is an unincorporated association with its principal office located in the village of Buckeye, Dickinson County, Kansas." [Pretrial Order Stipulations, ¶ (1).]

"[MAA] was organized in 1855, and has provided members of the Church of Brethren and their families with insurance protection against fire and other natural disasters, storms, vandalism, and other similar casualties continuously since that time. [MAA] also provides the same coverage to Church of the Brethren structures, and insures some small businesses provided they are owned only by Church of the Brethren members.

"[MAA] was organized by members of the Church of the Brethren (Mennonites) to implement their centuries old 'mutual aid' tenet of faith, which requires Church members to share one another's losses. Originally, this tenet was exemplified by the practice of 'barn raising' and other mutual in-kind assistance. However, such in-kind mutual aid gradually became less practical in the Nineteenth Century, due to the persecution of the Mennonites and their emigration to less populated Western areas, and the loss of building trade skills by other Mennonites who moved to the cities." [Pretrial Order Stipulations, ¶ (3).]

"The practice of mutual aid, however, is by no means directed solely toward church members. Mutual aid in both a religious and practical sense is extended to all people regardless of religious conviction." [Supplemental Stipulation, ¶ 3.]

"[MAA's stated] purpose, as set forth in Article I, Section II of its bylaws, is as follows:

> Section II. The purpose of the association shall be: to provide Church of the Brethren members with mutual protective fire and extended coverage property insurance program of Christian character in keeping with an old church custom.

[MAA's] President stated in its 1978 Annual Report that its purpose is to provide a channel through which Brethren could equitably share each other's losses even though unable to be physically present to directly lend aid. It was at its birth, and is today, an extension of the faith community. [MAA's] purpose and activities include providing disaster insurance and promoting the practice of mutual aid religious beliefs

and teachings among Church of the Brethren members." [Pretrial Order Stipulations, ¶ (4).]

MAA's president, Dale Correll, testified in his deposition that MAA "is operated primarily to provide economic and non-economic benefits to its members." [Supplemental Stipulation, ¶ 25 (citing Correll Deposition, at 52).]

"Section I of the rules and regulations of [MAA] generally restricts membership in the association to members of the Church of the Brethren and states... 'If a member of said association ceases to be a member of said church this policy shall be null and void, and shall be returned to the secretary for cancellation.'" [Pretrial Order Stipulations, ¶ (5).]

"[MAA] is a legal entity which is formally separate and apart from the Church of the Brethren. [MAA] is formally governed by its own membership and not by the administrative board of the Church of the Brethren." [Pretrial Order Stipulations, ¶ (6).]

"Out of approximately 180,000 members of the Church of the Brethren (located primarily in Pennsylvania, Virginia, Maryland, Kansas and secondarily in Ohio, Indiana and Missouri) approximately 2,500 are insured by [MAA]. Each of these 2,500 members of [MAA] represents a head of a household—therefore the actual number covered by MAA policies would be considerably larger. Of [MAA's] approximately 2,800 policies in force, about 350–400 are on church buildings." [Pretrial Order Stipulations, ¶ (9).]

"[MAA] is operated for the benefit of its members. [MAA's] income is generated primarily through assessments of premiums to members and through investment of surplus funds. A $10 lifetime membership fee collected on the sale of each initial policy also generates a negligible amount of income. This income is retained by [MAA] as a reserve against future claims. [MAA's] excess premiums and earnings not placed in the reserves for losses may be recirculated for the benefit of the members

in the form of lower rates or in the form of rebates or credits on future premiums.... The ultimate considerations of [MAA] in creating and using its surplus and profit are to provide a reasonable and adequate security margin, and to provide better protection and better services for its members." [Pretrial Order Stipulations, ¶ (12).]

"[MAA] has been exempted from the insurance laws of the state of Kansas by the insurance commissioner. Other states also exempt [MAA] from their insurance company regulations on the basis of non-regulation by [Kansas]. [MAA] has also received such exemption in the states of Virginia and Oklahoma. [MAA] is a member of the National Association of Mutual Insurance Companies and the Association of Mennonite Aid Societies." [Pretrial Order Stipulations, ¶ (14).]

Since 1972, MAA has had a "risk resharing or reinsurance agreement with Mennonite Indemnity, Inc., of Akron, Pennsylvania." [Pretrial Order Stipulations, ¶ (15).]

"... [MAA] provides indirect or incidental benefits to programs in and outside of the Church, including its support of a separate organization known as the Brethren Disaster Service, which is an informal or voluntary arm of the Church of the Brethren designed to provide relief to disaster stricken areas. [MAA] supports Brethren Disaster Service through newsletters, telephone calls, and mutual aid emphasis weekends." [Pretrial Order Stipulations, ¶ (17).]

"With respect to dissolution of [MAA], prior to October 19, 1978, the bylaws of [MAA] provided as follows:

> In the event of dissolution of the association all net assets remaining after payment of claims and expenses should be distributed in an equitable manner to the members, as of the date of enactment of the resolution for distribution."

[Pretrial Order Stipulations, ¶ (18).]

"As of October 19, 1978, [MAA's] bylaws were amended to provide that in the event of dissolution, distribution of the net assets of the association would be as follows: (a) ⅓ to Brethren Disaster Service; (b) ⅓ to Bethany Theological Seminary; and (c) ⅓ to the Church of the Brethren colleges in equal shares." [Pretrial Order Stipulations, ¶ (19).]

"From 1932 to 1958 [MAA] was exempted from taxation by the Internal Revenue Service as a 'Farmers, or Other Mutual Hail Cyclone, Casualty or Fire Insurance * * * Association * * *' under Section 103(11) of the Revenue Act of 1932, C.209, 47 Stat.1969. From 1958 until 1972 MAA was exempted from taxation by the Internal Revenue Service under Section 501(c)(15) of the Internal Revenue Code of 1954 (26 U.S.C.), as a 'Mutual insurance companies or associations other than life or marine, * * *' having gross income of $75,000 or less (prior to 1963) or gross income of $150,000 or less (after 1972). Since 1972 [MAA's] gross income has exceeded the maximum $150,000 gross income limit of 501(c)(15). Since 1972, [MAA] has filed federal income tax returns on Forms 1120M and computed its tax liability in accordance with Sections 821 through 826 of the Internal Revenue Code which impart a tax on mutual insurance companies. For the years 1975 through 1980 [MAA] has filed claims for refund of taxes paid, on the ground that it was exempt from federal income tax as a social welfare organization under Section 501(c)(4) of the Internal Revenue Code. [MAA's] claims for refund for 1975 through 1980 have either been disallowed or have been pending before the Internal Revenue Service for more than six months. The instant suit for refund of taxes was then filed on May 23, 1980." [Pretrial Order Stipulations, ¶ (20).]

## Discussion

■ This court is, of course, well acquainted with the standards governing consideration of a motion for summary judgment. The court must examine all the evidence in the light most favorable to the party opposing the motion. *Mogle v. Sevier County School District*, 540 F.2d 478, 482 (10th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977);

*Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir.1966). The burden is on the moving party to prove its entitlement to summary judgment beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.1975). Summary judgment is a drastic remedy to be applied with caution in order to preserve a litigant's right to trial. *Machinery Center, Inc. v. Anchor National Life Ins. Co.*, 434 F.2d 1, 6 (10th Cir.1970). If, after consideration of all the facts and the drawing of all inferences from those facts in favor of the party opposing the motion, it is discovered that no triable issue of material fact exists,' and the movant is entitled to summary judgment as a matter of law, the motion for summary judgment should be granted. *Ando v. Great Western Sugar Co.*, 475 F.2d 531, 535 (10th Cir.1973); *American Empire Ins. Co. v. Nugent*, No. 77–1466 (10th Cir., *unpublished*, 1/22/79).

The defendant herein (the government) contends first that the specific exemption provided by § 501(c)(15) for mutual insurance companies with a gross income of $150,000 or less precludes the general exemption of § 501(c)(4) in the instant case. In other words, the government contends that § 501(c)(15) is the exclusive means by which MAA can qualify for tax-exempt status. The government also contends that MAA does not qualify for exemption under § 501(c)(4) because it is not a "civic league or organization ... operated exclusively for the promotion of social welfare" within the meaning of the statute.

The plaintiff (MAA), on the other hand, argues that § 501(c)(15) is not the exclusive means by which it can qualify for tax-exempt status. MAA argues that there are material issues of fact precluding summary judgment in favor of the government and, in the alternative, that MAA is entitled to summary judgment because it meets the requirements of § 501(c)(4) as a matter of law. Specifically, MAA contends that its purpose is to effect the religious principle of mutual aid and, therefore, that it ad-

vances religion and thereby promotes the social welfare.

Section 501 of the Internal Revenue Code (26 U.S.C.) provides in relevant part as follows:

(a) Exemption from taxation. An organization described in subsection (c) ... shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

(c) List of exempt organizations. The following organizations are referred to in subsection (a):

    ✢      *      ❀      *      *      ❀

(4) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

■ The applicable regulations clarify the requirements of the statute.

(a) *Civic organizations*—(1) *In general.* A civic league or organization may be exempt as an organization described in section 501(c)(4) if—

(i) It is not organized or operated for profit; and

(ii) It is operated exclusively for` the promotion of social welfare.

26 C.F.R. § 1.501(c)(4)–1 (1982).

Thus, in order to qualify for an exemption under § 501(c)(4), MAA must establish that it is not organized or operated for profit and that it is operated exclusively for the promotion of social welfare.

■ The term "exclusively," as used in the statute and the regulations, has not been strictly interpreted, but has been construed to mean "primarily." *People's Educational Camp Society, Inc. v. Commissioner*, 331 F.2d 923, 930 (2d Cir.1964), *cert. denied*, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45; *Debs Memorial Radio Fund, Inc. v. Commissioner*, 148 F.2d 948, 952

(2d Cir.1945). Accordingly, the applicable regulations explain that:

> An organization is operated exclusively for the promotion of social welfare if it is *primarily* engaged in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated *primarily* for the purpose of bringing about civic betterments and social improvements.

> 26 C.F.R. § 1.501(c)(4)–1(a)(2)(i) (1982) (emphasis added).

Generally speaking, however, exemptions from federal income tax are to be strictly construed. *Bingler v. Johnson*, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949).

In light of the statute and regulations, the ultimate issue in this case is whether MAA is operated primarily for the purpose of promoting the social welfare. Although the question of a taxpayer's primary purpose presents a question of fact, *see Veterans Foundation v. United States*, 281 F.2d 912, 914 (10th Cir.1960), we believe that the record now before the court is more than adequate to provide a basis for summary judgment on that issue. MAA has submitted, and the court has considered, a voluminous collection of exhibits describing the development and practice of the religious principle of mutual aid by the Church of the Brethren and other groups, including MAA. In addition, MAA maintains that a trial is necessary for the presentation of additional evidence demonstrating its [MAA's] commitment to mutual aid. We are not convinced that a trial is necessary. The evidence presently before the court establishes that MAA is operated in part for the purpose of promoting the religious principle of mutual aid. Consequently, there is no need for the presentation of any additional evidence at trial.

■ MAA maintains that the advancement of religion is a charitable purpose within the meaning of § 501(c)(3), and, therefore, necessarily promotes the social welfare within the meaning of § 501(c)(4).

MAA maintains that the scope of the classification "social welfare organizations" under § 501(c)(4) is necessarily broader than the classification of "charitable organizations" under § 501(c)(3), and that § 501(c)(4) was enacted for the purpose of affording tax-exempt status to nonprofit organizations that were unable to satisfy the more rigorous requirements of § 501(c)(3). Although MAA's contention is supported to some extent by the legislative history of § 501(c)(4), *People's Educational Camp Society, Inc. v. Commissioner*, 331 F.2d 923, 930 (2d Cir.), *cert. denied*, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964), we are not persuaded that every organization that has a "charitable" purpose (such as advancement of religion) is *per se* a social welfare organization. In fact, the regulations interpreting § 501(c)(3) seem to distinguish between a "charitable" purpose and a "social welfare" purpose of an organization.

> The term "charitable" ... includes: Relief of the poor and distressed or of the underprivileged; *advancement of religion;* advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of government; *and promotion of social welfare by organizations designed to accomplish any of the above purposes*, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency.

> 26 C.F.R. § 1.501(c)(3)–1(d)(2) (1982) (emphasis added).

If a charitable organization with the purpose of "advancement of religion" were, necessarily, an organization with the purpose of promoting the social welfare, the provision in the regulations granting charitable status to the "promotion of social welfare by organizations designed to accomplish [a charitable purpose]" would be redundant. Rather, it appears that the terms "charitable" and "social welfare," although overlapping, are not coextensive,

and that "charitable" is not necessarily a subset of "social welfare."

■ We have no doubt that many churches and religious organizations can and do promote the social welfare. We are simply not convinced that a religious purpose is, *per se*, a promotion of social welfare. The plaintiff, MAA, is an example. Although its policies and practices appear to be largely consistent with the religious beliefs of the Church of the Brethren, these practices and policies clearly benefit a select few—MAA's members—far more than they benefit the general public or community as a whole.

■ Even assuming, arguendo, that the advancement of religion is, *per se,* the promotion of social welfare, our analysis cannot end there. MAA's own statement of its purpose is not conclusive. *Contracting Plumbers Cooperative Restoration Corp. v. United States,* 488 F.2d 684, 687 (2d Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *Consumer-Farmer Milk Cooperative, Inc. v. Commissioner,* 186 F.2d 68, 71 (2d Cir.1950), *cert. denied,* 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360 (1951). The court must determine, in light of the uncontroverted facts now before it, what the controlling purpose of MAA is.

The government correctly points out that "the presence of a single substantial non-exempt purpose precludes exempt status regardless of the number or importance of exempt purposes." *Contracting Plumbers, supra,* 488 F.2d at 686; *People's Educational Camp Society, Inc., supra,* 331 F.2d at 931; *American Women Buyers Club, Inc. v. United States,* 338 F.2d 526, 528 (2d Cir.1964). *See also, Better Business Bureau of Washington, D.C., Inc. v. United States,* 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945); *Commissioner v. Lake Forest, Inc.,* 305 F.2d 814, 820 (4th Cir.1962). Accordingly, the government contends that MAA's alleged religious purpose is irrelevant because economic benefit to its members is clearly a substantial purpose of the organization.

MAA responds to the government's argument by asserting that all of the policies and practices of MAA, including the restriction to members of the Church of the Brethren, are consistent with and in furtherance of the organization's religious philosophy of mutual aid. MAA contends that "a non-exempt purpose or activity will not deprive an organization of § 501(c)(3) or § 501(c)(4) exemption if it is only 'incidental' to the organization's primary exempt purpose." (Plaintiff's Brief, at 35.)

■ We believe that this rule was better stated by the court in *United States v. Pickwick Electric Membership Corp.,* 158 F.2d 272, 276 (6th Cir.1946), where the court held that the establishment of an electric cooperative with profit inuring to the benefit of members was "a necessary incident" of its public purpose of developing an ongoing electrical distribution system. Accordingly, we believe that *Pickwick* and the other cases cited by the plaintiff in support of its contention are distinguishable from the case at bar. In light of the uncontroverted facts before the court, we cannot conclude that the distribution of economic benefit to MAA's members, in the form of rebates or reduced premiums, or prior to October 19, 1978, in the distribution of assets upon dissolution, are "necessary incidents" of the religious philosophy of mutual aid "to all people regardless of religious conviction." Rather, we must conclude that the conferral of economic benefit upon its members is a substantial non-exempt purpose of MAA. Accordingly, although we are sympathetic to the position of MAA and commend its participation in such worthy programs as the Brethren Disaster Service, we believe that under the existing case law we have no alternative but to hold that MAA does not qualify for exemption as a "social welfare organization" under § 501(c)(4). Thus, MAA is not entitled to a refund of income taxes paid.

Because we conclude that plaintiff is not exempt from taxation under 26 U.S.C. § 501(c)(4), we need not address the defendant's argument that 26 U.S.C. § 501(c)(15) is the exclusive provision under which plaintiff can qualify for exemption.

IT IS THEREFORE ORDERED that defendant's renewed motion for summary judgment be and hereby is granted. IT IS FURTHER ORDERED that plaintiff's cross-motion for summary judgment be and hereby is denied.